1

2

3

4

5

6

7

8     **UNITED STATES DISTRICT COURT**

9     **SOUTHERN DISTRICT OF CALIFORNIA**

10

11    MARCUS BOVARIE,                                    )     Civil No.08cv1661 LAB (NLS)
                                                         )
12                        Plaintiff,                     )
      v.                                                 )     **REPORT AND RECOMMENDATION**
13                                                       )     **OF U.S. MAGISTRATE JUDGE RE:**
      ARNOLD SCHWARZENEGGER, Governor;                   )     **DEFENDANTS' MOTIONS FOR**
14    PRIVATE HEALTH CARE COMPANY,                       )     **SUMMARY JUDGMENT**
      "Company X"; MATTHEW CATES,                        )
15    Secretary of Corrections; JAMES E.                 )     [Docket Nos. 91, 92.]
      TILTON, Former Secretary of Corrections;           )
16    MICHAEL SMELOSKY, Warden, Centinela                )
      State Prison; V.M. ALMAGER, Former                 )
17    Warden, Centinela Prison; G.J. GIURBINO,           )
      Former Warden, Centinela Prison; N.                )
18    BARRERAS, M.D., L. CALDERON, Health                )
      Care Manager, Centinela Prison; D.                 )
19    KHATRI, M.D., SUMMER AYMAR, D.O.;                  )
      MANAIG, R.N.; J. ROBINSON, R.N.;                   )
20    CANDI COOK, Medical Appeals Analyst;               )
      TETTEH, M.D.; KO, M.D.; HODGE, N.P.;               )
21    C. HAMMOND, Staff Services Manager I;              )
      NAVAMANI, M.D.; Does 1-20,                         )
22                                                       )
                          Defendants.                    )
23    _____          )

24    / / /

25    / / /

26    / / /

27    / / /

28    / / /

1

## I.   BACKGROUND

Plaintiff Marcus Bovarie ("Plaintiff"), is a state prisoner committed to the custody of the California Department of Corrections and Rehabilitation ("CDCR"), currently incarcerated at Avenal State Prison in Avenal, California. Plaintiff, proceeding *pro se* and *in forma pauperis*, filed suit pursuant to the Civil Rights Act, 42 U.S.C. § 1983, for violations of his Eighth Amendment rights. Plaintiff also asserts claims under California law for violation of California Government Code Section 845.6, failure to summon medical help, and malpractice. The essence of Plaintiff's claim is that he received inadequate medical care while incarcerated at Centinela State Prison. Currently pending before the Court is Defendant Summer Aymar's (" Defendant Aymar") Motion for Summary Judgment [Doc. No. 92]. Also currently pending before the Court is a Motion for Summary Judgment by Defendant Manaig. [Docket No. 91.][1] On May 13, 2011, Plaintiff filed an Opposition to Defendant Aymar's Motion and to Defendant Manaig's Motion. [Docket No. 102.] On May 11, 2011, the Court issued an Order Requiring Additional Briefing on the State Law Claims by Defendant Manaig and setting an extended briefing schedule. [Docket No. 100.] On May 19, 2011, Defendant Aymar filed a Reply to the Motion. [Docket No. 106]. On May 31, 2011, Defendant Manaig filed a Reply Brief. [Docket No. 110]. Pursuant to Court Order, on July 5, 2011, Plaintiff filed a Sur-Reply Brief to Defendant Manaig's Motion. [Docket No. 121.] Defendants' Motions have been referred by the presiding District Judge to the undersigned for preparation of a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 72.3(f).

After careful consideration of the moving papers, all supporting documentation, and the applicable law, the Court **RECOMMENDS** that Defendant Aymar's Motion for Summary Judgment [Docket No. 91] and Defendant Manaig's Motion for Summary Judgment [Doc. No. 92] be **GRANTED**.

## II.   STATEMENT OF THE CASE

Plaintiff  filed this lawsuit on September 10, 2008, and pursuant to 28 U.S.C. §636(b) and Civil Local Rules 72.1(c) and (d) it was referred to the undersigned Magistrate Judge for a Report and

---

[1]At a Mandatory Settlement Conference on April 27, 2011, the parties reached a partial settlement of the case. On May 6, 2011, the Court Granted a Joint Motion to Dismiss Defendants Navamani, Barreras and Calderon. [Docket No. 99.] On May 31, 2011, the Court Granted a Joint Motion to Dismiss Defendant Khatri. [Docket No. 111.] Accordingly, the only Defendants remaining in this case are Aymar and Manaig.

1    Recommendation ("R&R").  Because Bovarie is proceeding *pro se*, the Court screened his complaint

2    pursuant to 28 U.S.C. § 1915(e)(2)(B) and dismissed it for failure to state a claim.  [Doc. No. 3.]  Bovarie

3    then filed his First Amended Complaint ("FAC") [Doc. No. 6], which the Court again screened and

4    dismissed, but only as against certain defendants.  [Doc. No. 8.]  The Court denied Plaintiff's motion for

5    class certification and dismissed Plaintiff Wayne Wicken because he failed to file a Motion to Proceed *In*

6    *Forma Pauperis*, and because Plaintiff did not have any authority to represent him.  The Court dismissed

7    Defendants Schwarzenegger, Cates, Tilton, Smelosky, Almager, and Giurbino because Plaintiff did not

8    allege that any of these defendants were directly involved in or responsible for the inadequate medical care

9    he allegedly received, and there is no respondeat superior liability under 42 U.S.C. § 1983.  The Court also

10   dismissed Defendants Tetteh, Ko and Hodge because they only treated Wicken.   [Docket No. 57.]

11   Additionally, the claims against all Defendants in their official capacity were dismissed.

12   **III.    OBJECTIONS TO EVIDENCE**

13       Defendants Manaig and Aymar object to Plaintiff's six unsworn affidavits. [Docket No. 102-1, pp

14   7-13.] Each affidavit is signed by Plaintiff and Affidavits 1-3 and 5-6 contain the following statement: "I

15   have first hand knowledge of this and I am prepared to testify to the veracity of these statements." [Docket

16   No. 102-1, Ex. C.] It appears to the Court that Plaintiff was, to the best of his ability, attempting to comply

17   with the requirement that affidavits be sworn under penalty of perjury.  If evidence is "presented in an

18   inadmissable form" it may still be considered at the summary judgment stage, so long as "the contents of

19   the evidence would be admissible at trial." *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At

20   the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus

21   on the admissibility of its contents."). As this evidence could be admissible at trial, the Court Recommends

22   that the affidavits not be stricken and the affidavits will be considered in making this Report and

23   Recommendation.

24       Defendant Manaig also specifically objects to Affidavit 1 on the basis that it contains hearsay.

25   Affidavit 1 attempts to introduce evidence of what the radiologist  "called my attention to" and "explained"

26   and "said." This is improper hearsay. Fed. R. Evid. 801 & 802.  Although the court must construe *pro se*

27   pleadings liberally, "pro se litigants must follow the same rules of procedure that govern other litigants."

28   *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987).   Unlike Plaintiff's failure to properly swear out his

affidavit under penalty of perjury, this evidence could not be admissible at trial.   Accordingly, the Court Recommends that the parts of Affidavit 1 that repeat what the radiologist communicated to Plaintiff be stricken and the Court will not consider these statements in making this Report and Recommendation.

Additionally, Defendant Manaig objects to Plaintiff's statement in Affidavit 1 that "I could see, on the screen, small round objects moving right where she was pointing and telling me to look." (Affidavit 1.) Defendant Manaig argues that interpreting an ultrasound image requires expert qualifications that Plaintiff does not possess.  Plaintiff claims "anyone can observe round objects moving on a screen.  This is hardley [sic] expert material and this should be enough to be relevant, especially since other evidence shows conclusively that Plaintiff had gall stones." (Sur-Reply at 2.)  The court cannot agree that any person can interpret the ultrasound results.  *See McGuinness v. Apfel*, 2000 WL 1785532 at * 5 (N.D. Ill Dec. 5, 2000)(ALJ erred in using "lay medical judgment" to interpret results of ultrasound.)[2]  Moreover, Plaintiff's own observation only makes sense in the context of the inadmissible statements by the radiologist.  Accordingly, the Court Recommends that the Plaintiff's lay medical opinion be stricken and the Court will not consider it in making this Report and Recommendation.

Defendant Manaig also objects to Plaintiff's Exhibit J, a partially granted inmate appeal.  Defendant Manaig claims that the appeal is hearsay and not relevant.  The Court does not agree.  The fact that Plaintiff filed an inmate appeal about the quality of the food is relevant.  On the other hand, the statements contained within the appeal cannot be considered for the truth of the matters asserted in them without violating the hearsay rule.

Additionally, Defendant Manaig objects to Exhibit M in that the document is not properly authenticated, is inadmissible hearsay, and inadmissible lay opinion.  As discussed above, at summary judgment it is not necessary for documents to be properly authenticated, so long as the evidence could be admissible at trial.  Exhibit M appears to be an official publication from the U.S. Department of Health and Human Services. As such, it falls under the exception to the hearsay rule for public records and reports. Fed. R. Evid. 803(8); *see also Watson v. Goldberg,* 2008 WL 2944998 (D. Or. July 23, 2008) *5 at n. 4; *California Ass'n of Bioanalysts v. Rank*, 577 F.Supp. 1342, 1355 n. 23 (C.D. Cal. 1983).

---

[2]As discussed fully below, the existence of stones in July of 2008 is not conclusively established by the medical evidence.

Moreover, Plaintiff asks the court to take judicial notice of the inmate appeal.  (Opp. at 1.)  A Court may take judicial notice of any fact that is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b).  There is no dispute that this appeal was filed and partially granted.  Accordingly, the court can take judicial notice of the fact that the appeal was filed, but not of the truth of statements contained within the appeal.

Finally, Defendant Manaig objects to Plaintiff's medical conclusion that medium size gallstones removed in February of 2009 "shows they were present in 2007 and 2008."  The Court agrees that this is either speculative or impermissible lay medical opinion.  Fed. R. Evid. 401, 402 and 701; *see also Allen v. Scribner*, 812 F.2d 426, 438-39 (9th Cir. 1987)("The parties are entitled to have the determination of their rights rest on more than speculation and guesswork.")  Accordingly, the Court Recommends that this speculative lay medical opinion testimony be stricken and it will not be considered in this Report and Recommendation.

## IV.    FACTS OF THE CASE

Defendant Aymar is a licensed Doctor of Osteopathic Medicine who worked with the California Department of Correction at Centinela Prison.  (Aymar Decl ¶ 2.)  Defendant Manaig is a Licensed Registered Nurse who worked at all relevant times at Centinela Prison.  (Manaig Decl ¶ 2, FAC ¶ 21.)

Plaintiff claims he "became suddenly extremely ill" on June 14, 2007, but claims he did not receive any medical care for approximately eleven days.  (FAC ¶ 36).  At Centinela, in order to obtain medical care absent an obvious emergency, a prisoner had to fill out a medical request form. The prisoner would then be seen by a triage nurse who would either resolve the problem or schedule the prisoner for an appointment with a physician . (Aymar Decl. Ex. 1, Bovarie Depo. Tr. at 15-20.)

On June 21, 2007,  Plaintiff submitted a Health Care Services Request Form 7362 stating: "Due to filthy food carts I got sick from the food on 6/14 with headache, upset stomach, fatigue, and kidney pain and I have been submitting med. requests since then to no avail.  I still feel weak, fatigued, and have kidney pain.  The carts were so dirty there would actually be mice and vermin in with the food if that makes any

difference." (Manaig Decl ¶ 4, Medical Records AGO- 155[3], Baxter Decl. Ex. A [Docket Nos. 91-3, 91-4.].)
Plaintiff also submitted a second Health Care Services Request Form on the same day, this one stating: "Got very sick from food on 6/14. Experiencing fatigue headache upset stomach + kidney pain. I believe I may have a serious kidney infection." (Manaig Decl ¶ 4, Medical Records AGO- 156.) There is no evidence in the record to support the assertion that Plaintiff submitted any requests for health care between June 14, 2007 and June 21, 2007.

Plaintiff was first seen by Defendant Manaig on June 25, 2007, four days after submitting the Health Care Services Request Form. (FAC ¶ 37.) Defendant Manaig checked Plaintiff's vital signs and found they were within normal limits and noted that Plaintiff had no flank pain, low back pain, urinary frequency, dysuria (painful urination), burning on urination, hematuria (red blood cells in the urine), muscle spasms, numbness or tingling. (Manaig Decl ¶ 5, Medical Records AGO-157.) Defendant Manaig also conducted a dipstick urinalysis and the results were negative for signs of infection. (Manaig Decl. ¶ 5, AGO 155, 157, 457.) Defendant Manaig recorded the results of the examination on the encounter form. (Manaig Decl. ¶ 5, AGO-157.) Defendant Manaig referred Plaintiff for a medical evaluation. (*Id.*). Plaintiff "clearly explained" to Manaig that he "had fallen seriously ill with weakness, exhaustion, loss of equilibrium and severe kidney pain." (Plaintiff's Affidavit 4.)

Defendant Manaig also referred Plaintiff for a mental health screening. (Manaig Decl. ¶ 5, AGO-646). The referral for mental health screening states that Plaintiff "thinks that something is squeezing his kidneys which he got from poisoned state food." (AG0-646.) Manaig observed that Plaintiff had a history of submitting Health Care Services Request Forms for alleged instances of food poisoning and believed this history of asserting the prison food was "poisoned" warranted the referral for mental health screening. (Manaig Decl. ¶ 5, AGO-646, 170, 171, 174, 179.)

Plaintiff claims he has only complained of a single episode of food poisoning, that the episode was in 2006, and that he received a prescription for cephalexin, which cleared up the problem. (Plaintiff's Affidavit 5.) The medical records, however, contain support for Manaig's perception of multiple complaints relating to food poisoning. On a March 7, 2006 Health Care Services Request Form, Plaintiff wrote: "I was

---

[3]Plaintiff's medical records can be found at Baxter Decl. Ex. A [Docket Nos. 91-3, 91-4.] and will be referred to as "AGO - __."

afflicted w/ food poisoning on 1/16/06 and I was given antibiotics that knocked it out, but I been having continuous stomach problems." (AGO-179.) On a May 26, 2006 Health Care Services Request Form, Plaintiff wrote: "1st off I need to see a Dr. rather than a RN because I got sick from the food in January and I've had stomach problems since then (very loose stool). I've been in several times without real treatment." (AG0-171). On an April 19, 2006 Health Care Services Request Form, Plaintiff wrote: "Stomach problems since 1/16/06, when I contracted food poisoning (Gas, occasional cramps, loose stool)." (AGO-174.) Similarly, on a Health Care Services Request Form dated August 10, 2006 , Plaintiff wrote: "diarrhea [sic] +cramps + gas from food + refill ingerall LA 80 mg." (AG-170).

On July 16, 2007, Plaintiff submitted a Health Care Services Request Form stating: "I am supposed to take aspirin daily for heart condition but it ran out awhile back." (AGO-154.) On July 22, 2007, Plaintiff submitted another Health Care Services Request Form, this time stating "I have a large infection on r. little toe and it looks like MRSA (staff). Pain, redness and swelling." (Manaig Decl. ¶ 7, AGO-153.) Defendant Manaig received and reviewed this form on July 23, 2007. (*Id.*). Defendant Manaig examined Plaintiff on July 26, 2007 and, while he did observe a wound, he saw no signs of drainage and no erythema (redness or inflamation). Defendant Manaig did not believe Plaintiff had an infection. (Manaig Decl. ¶ 8.)

On August 1, 2007, Plaintiff was seen in clinic by Dr. Khatri, who renewed prescriptions for Inderal as a prophylaxis for migraine headaches, aspirin, as a prophylaxis for heart disease, and glucosamine, for joint pain. Dr. Khatri performed a lymph node examination, heart examination, chest examination, abdominal examination, gait examination, and hernia examination, which showed him to be normal by Dr. Khatri's standard exam. (Khatri Decl. ¶ 4.) Dr. Khatri ordered blood tests, a CBC, Chem. Panel, and Lipids. (Khatri Decl. ¶ 4, AGO-42, 151.) At this visit, Plaintiff did not voice any other issues regarding abdominal pain, liver, kidney or spleen related problems. (Khatri Decl. ¶ 4.)

On August 9, 2007, Plaintiff submitted another Health Care Services Request Form, in which he stated "I have been suffering from Kidney pain and weakness for two months. Khatri ordered blood tests on 8/1/07 but there were never any tests." For reasons not specified in the record, the blood was not drawn until August 17, 2007. The lab report dated August 18, 2007 indicates no need for any further treatment. (Khatri Decl. ¶ 7, AGO-455.)

On September 8, 2007, Plaintiff submitted a Health Care Services Request Form stating: "Kidney

1    pain & weakness since 6/14.  I get weak & tired if I even stand for more than short periods & I had constant

2    kidney pain for almost 3 months now."  (Manaig Decl. ¶ 9, AGO -150.)   Defendant Manaig received this

3    form on September 11, 2007 and evaluated Plaintiff on September 12, 2007.  (Manaig Decl. ¶¶ 9-10.)

4    Defendant Manaig recorded on the encounter form that Plaintiff denied feeling any pain at the time of the

5    evaluation and referred Plaintiff to the physician clinic.  (Manaig Decl. ¶ 10, AGO-149.)

6         Plaintiff was seen by Dr. Aymar on September 19, 2007.  Plaintiff declares he informed Dr. Aymar

7    that he believed he had kidney damage.  He also explained his pain, that it felt like he was being stabbed

8    in the right kidney regularly and that "it was so bad it would wake me in the night and whenever it struck

9    leave me sweating and shaking."  (Plaintiff's Affidavit 6, [Docket No. 102-1] Ex C to Opp to MSJ.).

10   Defendant Aymar conducted a physical examination of Plaintiff and detected no problems with his

11   cardiovascular system, lungs, abdomen or extremities.  (Aymar Decl. ¶ 4, Notice of Lodgments ("NoL")

12   [Docket No. 92-5], Ex. 15).  Plaintiff reported that his fatigue had resolved, but his allergies were acting up.

13   (*Id.*)  Defendant Aymar reviewed Plaintiff's lab results from August 2007 with him and she "did not see any

14   issues which would raise any medical concerns."  (Aymar Decl. ¶ 4.)   Aymar ordered a two month supply

15   of claritin for allergies and a one month supply of Naphcon A, eye drops to help clear up an irritation with

16   his eyes.

17        Plaintiff next saw Dr. Aymar on October 25, 2007.  (Bovarie Depo. Tr., NoL Ex. 1.)  Plaintiff was

18   seeking medical refills for migraine treatment.  (NoL, Ex. 18, Aymar Decl. ¶ 7.)  Dr. Aymar performed an

19   extensive chart review and noted there were no x-rays of Plaintiff's knee and no documented joint disease.

20   Dr. Aymar ordered an x-ray of Plaintiff's left knee and a urinalysis.  (NoL Ex. 19.)  Dr. Aymar also ordered

21   daily aspirin and propranolol for six months. (*Id.*, Aymar Decl. ¶ 9.)  Dr. Aymar reviewed the urinalysis on

22   November 6, 2007 and the results did not demonstrate any factors requiring additional follow up.  (NOL

23   Ex. 20, Aymar Decl. ¶ 10.)

24        On November 22, 2007, Plaintiff submitted a Health Care Services Request Form stating: "I have

25   been having intermittent bouts of breathing problems with some chest congestion for awhile now, but its

26   worse lately."  (Manaig Decl. ¶ 11, AGO-144.)  Defendant Manaig received the request on November 26,

27   2007 and evaluated Plaintiff on November 27, 2007.  (Manaig Decl. ¶¶ 11-12.)  Defendant Manaig again

28   completed an encounter form and recommended that Plaintiff receive medications in the viral rhinitis

1    protocol, including acetaminophen, antihistamine, sugar free cough lozenges and warm salt water gargles.

2    (Manaig Decl. ¶ 12, AGO-145.)  No referral to a physician was made at this time.  (AGO-145.)

3         On December 12, 2007, Plaintiff submitted a Health Care Services Request Form stating: "stabbing

4    pains in R. Kidney.  Been having kidney pain for 6 months since becoming very ill in June with severe

5    exhaustion, confusion, and kidney pain."  (Manaig Decl. ¶ 13, AGO-143.)  Manaig received the form on

6    December 14, 2007 and evaluated Plaintiff on December 17, 2007.  (Manaig Decl. ¶¶ 13-14.)  Manaig

7    recommended Ibuprofen and a follow up visit in the physician clinic.  (Manaig Decl. ¶ 14, AGO -142.)  On

8    the same day, Nurse Practitioner Carreno ordered a urinalysis for Plaintiff.  (Manaig Decl. ¶ 14, AGO - 38.)

9

10        On January 9, 2008, Plaintiff submitted a Health Care Services Request Form claiming the original

11    illness in June 2007 and stating "I still have a lot of pain in my R. kidney that radiats [sic] to the front."

12    (AGO-141.)  The form stated that Defendant Manaig had referred him to see a doctor, but his ducat was

13    cancelled.  The form also states "scheduled 1/15/08."  (*Id.*)  Plaintiff was seen by Dr. Navamani on January

14    25, 2008.  (Barreras Decl. ¶ 24.)  Dr. Navamani ordered a helical CT/KUB scan to rule out urinary calculus.

15    (Barreras Decl. ¶ 25.)   The request was approved by the Medical Authorization Review Committee.

16    (BARRERAS Decl. ¶ 25, AGO-139.)  For unknown reasons, however, the scan was not performed at that

17    time.  Dr. Navamani also ordered a urinalysis, which showed no sign of illness.  (Khatri Decl. ¶ 13, AGO

18    -448.)  On February 5, 2008, Plaintiff's blood was tested and the test results contained no indications of the

19    presence of a serious medical condition.  (Khatri Decl. ¶ 12, AGO - 448-49.)

20        On February 20, 2008, Plaintiff submitted a Health Care Services Request Form stating: "stomach

21    problems: need refill on pepto bismol tabs RX.  DR LINE ONLY."  (Manaig Decl. 15, AGO 138.)  On

22    February 21, 2008, Plaintiff submitted a Health Care Services Request Form stating: "I have a lot of pain

23    in my R. Kidney that radiates to the front.  This has been ongoing for many months and lately I've been

24    feeling weak and drained in addition." (AGO-136.)  It is not clear from the record who reviewed this

25    request, but Plaintiff was scheduled for a routine appointment with a doctor within fourteen days.  (AGO

26    136.)

27        On March 5, 2008, Plaintiff saw Dr. Navamani, who entered another order for the CT scan.  (Bovarie

28    Depo. Tr. at 78, Baxter Decl. Ex. B.)  For reasons not explained by the record, on  June 18, 2008, the Scan

1   still had not been performed.  (*Id.*)

2       On April 29, 2008, Plaintiff submitted a Health Care Services Request Form stating: "Difficulty

3   Breathing/sore throat." (AGO-134.) Defendant Manaig received and reviewed this form on April 30, 2008

4   and evaluated Plaintiff on May 1, 2008. (Manaig Decl. 17, AGO 134-35.)  Defendant Manaig recommended

5   the viral rhinitis protocol of acetaminophen, antihistamine, cough lozenges and warm salt water gargles.

6   (Manaig Decl. ¶ 17, AGO-135.)

7       On June 18, 2008, Plaintiff received a clinic appointment with Dr. Navamani.  Plaintiff complained

8   of foot pain, headache, and kidney pain and requested sunscreen.  Dr. Navamani made a referral for an

9   ultrasound of Plaintiff's kidneys.  (Barreras Decl. ¶ 30.)  On June 20, 2008, the Medical Authorization

10  Review Committee approved the request. (Barreras Decl. ¶ 31, AGO-132.) On July 2, 2008, the ultrasound

11  was completed.  (AGO 131, 492.)  On July 8, 2008, Dr. Joy Mason-Johnson  read the ultrasound and found:

12  1) cholelithiasis (stones in the gallbladder) or tumefactive sludge (presence of biliary fluid accumulation

13  in the gallbladder that has not formed into stone) noted in the gallbladder, with enlargement of the common

14  hepatic duct, 2) a spleen enlarged to 13 cm in size, and 3) hydronephrosis (dilation of the kidney due to

15  accumulation of urine caused by a blockage in the urinary tract) of the right kidney.  (Barreras Decl. ¶ 34;

16  Khatri Decl. ¶ 12).

17      On July 18, 2008, Plaintiff was sent to Pioneers Memorial Healthcare District Hospital ("Pioneers

18  Hospital") based on a complaint of abdominal pain and for further testing in light of the abnormal

19  ultrasound. (Barreras Decl. ¶ 46.)  He received a CT scan, which showed:  "There is a considerable amount

20  of stool within the colon.  No bowel obstruction, free fluid, or acute inflammatory process is seen.  The

21  appendix is normal in appearance.  The kidneys, liver, spleen, and pancreas are unremarkable." (Barreras

22  Decl. ¶ 36; Khatri Decl.,  ¶ 9.).  When Plaintiff was discharged from the hospital, the discharge stated:

23  "after thorough historical inquiry, physical examination, and ancillary testing, no evidence for any emergent

24  conditions was found." (AGO 550.)  A CT scan is a more specific, sensitive, and precise tool for ruling out

25  pathology of internal organs than is an ultrasound. (Khatri Decl., ¶ 12.)  The Pioneers Hospital Emergency

26  Room also performed blood and urine tests.  The Complete Blood Count (CBC) test showed that the values

27  for White Blood Count (WBC), hemoglobin, hematocrit, and platelets were all within reference range.

28  Lipase and amylase were within reference range.  The urine dipstick was negative for leukocytes, nitrites,

protein, bilirubin, and blood.  Uribilinogen was positive.  Accordingly, neither the blood test nor the urine test showed any disease processes.  (Barreras Decl. ¶ 36; Khatri Decl. ¶ 10.)

On July 21, 2008, Plaintiff was again sent to Pioneers  Hospital for the CT scan of his abdomen and pelvis with and without contrast. (Barreras Decl. ¶ 38, Khatri Decl. ¶ 11, AGO 431.) The kidneys appeared normal. The adrenal glands appeared normal. The pancreas, liver, and spleen were unremarkable. The lung bases were clear. There was no free fluid in the pelvis or abdomen. There was no adenopathy (enlargement of a lymph node). The gallbladder appeared unremarkable. The bowel was unremarkable. The only potential problems noted were an apparent enlarged prostrate (which could have been prostatitis) and a right-sided L5 Pars defect (a lower back condition)  with contralateral evidence that it was a chronic defect. (Barreras Decl.  ¶ 38; Khatri Decl. ¶ 11.)  Thus, two CT scans, which are more precise than an ultrasound, contradicted the findings of the ultrasound and indicated that Plaintiff was not suffering from any internal organ pathology.  Moreover, the ultrasound report states "**either** a stone or tumefactive sludge in the gallballder." (Opp. Ex. A.) (emphasis added).  Thus, the report does not establish the presence of gallstones in July of 2008, only the possibility.

On August 4, 2008, Plaintiff  saw Dr. Vonlintig, who recommended elective gallbladder surgery. (AGO-125)  Dr. Vonlintig documented that Plaintiff asked to try a conservative treatment first.  (*Id.*) According to his wish, Plaintiff was prescribed  Ursodiol on August 4, 2008.  (AGO -31).  For reasons not specified in the record, Plaintiff did not receive his prescription until he was seen on August 30, 2008 by Nurse Practitioner Carreno.  (Barreras Decl. ¶ 40, AGO-123).  On September 29, 2008, Plaintiff saw Dr. Davenport, who noted that Plaintiff had discontinued the Ursolidol due to nausea. Dr. Davenport also noted that Plaintiff  was "still not interested in surgery"  (AGO-121.)

On October 8, 2008, and again on October 9, 2008,  Plaintiff  submitted a Health Care Services Request Form stating that he wanted to discuss surgery. (AGO-119, 120).  Plaintiff was referred to Dr. Davenport for a routine General Surgery consult for an elective cholecystectomy procedure.  (AGO-502).   On October 15, 2008, Dr. Davenport  approved the request for the consultation. (AGO-482.)  There is no evidence before the Court that this consultation took place.  In November of 2008, Plaintiff was transferred to Avenal State Prison. (Barerras Decl. ¶ 45, AGO-374.).

On November 20, 2008, Plaintiff was seen by Dr. Conanan at Avenal.  (AGO-503.)  Dr. Conanan

referred Plaintiff for a routine (not emergent or urgent) surgical consultation. (AGO-503).  On December 17, 2008, Plaintiff was seen by Dr. Henry, who recommended Plaintiff receive the laparoscopic cholecystectomy.  (AGO-503-04.)  The surgery was performed on February 5, 2009 at Twin Cities Community Hospital in Templeton Ca. (AGO-484-489.)  The history taken at the time plaintiff was examined states his "past history" as "Really unremarkable" and his physical examination states that he was "in no acute distress."  (AGO-489.)  Additionally, the Surgical Pathology report states: Polyps of Cholesterolosis; No Stones Received; No significant inflammation in the sections examined." (AGO-491.)

## V.   LEGAL STANDARDS

### A.   Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

A party seeking summary judgment bears the initial burden to establish an absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  The moving party can satisfy this burden by (1) presenting evidence that negates an essential element of the non-moving party's case; or (2)  demonstrating that the nonmoving party failed to establish an essential element of that party's case for which that party bears the burden of proof.  *Id.* at 322-23.  This burden requires the moving party to identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

If the moving party meets this burden, the non-moving party cannot defeat summary judgment by merely demonstrating "there is some metaphysical doubt as to the material facts."  *Scott v. Harris*, 550 U.S.372, 380 (2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).  Rather, the non-moving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there

1   is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  When determining

2   summary judgment, the court must view the underlying facts in the light most favorable to the party

3   opposing the motion.  *See Matsushita*, 475 U.S. at 587.

4       **B.    Section 1983**

5       "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

6   vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 393-94 (1989)

7   (quotation omitted).  A section 1983 claim must allege: (1) a violation of rights protected by the Constitution

8   or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting under color of

9   state law." *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). To prevail, a claimant must prove that:

10  (1) a person acting under color of state law committed the conduct at issue, and (2) the conduct deprived

11  the claimant of some right, privilege, or immunity protected by the Constitution or laws of the United States.

12  42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), *overruled on other grounds by Daniels v.*

13  *Williams*, 474 U.S. 327, 328 (1986); *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).

14      **C.    Eighth Amendment Deliberate Indifference to Serious Medical Need**

15      Prison officials violate a prisoner's Eighth Amendment right to be free from cruel and unusual

16  punishment if they are deliberately indifferent to the prisoner's serious medical needs. *Estelle v. Gamble*,

17  429 U.S. 97, 106  (1976); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).  To succeed on a

18  deliberate indifference claim, a plaintiff must demonstrate facts sufficient to prove that he has or had a

19  serious medical need and that a particular defendant acted with deliberate indifference to that need.  *See*

20  *Estelle*, 429 U.S. at 104-5.

21      A prisoner must satisfy both objective and subjective elements to establish an Eighth Amendment

22  violation. *Farmer v. Brennan*, 511 U.S. 825, 834-837 (1994).  The court must focus on the seriousness of

23  the prisoner's medical needs and the nature of the defendants' response to those needs.  A "serious" medical

24  need exists if the failure to treat a prisoner's condition could result in further significant injury or the

25  "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104; *Silvis v. CDCR*, 2011 WL 766130

26  (E.D. Cal. Feb. 25, 2011).

27      To establish the subjective component of a deliberate indifference claim, "an inmate must allege

28  sufficient facts to indicate that prison officials acted with a culpable state of mind." *Wilson v. Seiter*, 501

U.S. 294, 302 (1991).  A prison official must have actual knowledge of an "excessive risk to inmate health and safety," possessing both the facts from which an inference of serious risk to health and safety could be drawn and then drawing that inference.  *Farmer*, 511 U.S. at 837.   "[M]ere malpractice, or even gross negligence" is not sufficient, without more, to constitute "deliberate indifference." *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).   "If a person should have been aware of the risk, but was not, then the person has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. County of Washoe, Nev*., 290 F.3d 1175, 1187-88  (9th Cir. 2001).  Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim.  *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  Indeed, differences of opinion amongst doctors are not sufficient to establish deliberate indifference.  *Toguchi v. Chung* 391 f.3d 1051, 0158 (9th Cir. 2004.)

Moreover, a mere delay in treatment does not constitute a violation of the Eighth Amendment, unless the delay was harmful.  *See Shapley v. Nevada Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985)("mere delay of surgery, without more, is insufficient to state a claim of deliberate medical indifference.");  *Esposito v. D. Khatri*, 2009 WL 702218, at *4 (S.D. Cal. Mar 16, 2009)("For a delay to violate the Eighth Amendment, it must cause serious harm to the inmate.")  A plaintiff must establish a causal link between the defendants' conduct and the alleged injury.  Without causation, there is no deprivation of a plaintiff's constitutional rights.  *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976).

### D.    Qualified Immunity

Defendant Manaig argues summary judgment is appropriate because there is no genuine dispute that he is entitled to qualified immunity because, based on the circumstances of Plaintiff's medical care, it would not have been clear to a reasonable government official that Plaintiff's rights were being violated.

Qualified immunity entitles government officials to "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  The Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, 227 (1991).  Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted).  Generally, the qualified immunity doctrine must "'give[] ample room for mistaken judgments by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter*, 502 U.S. at 229.  Even if a constitutional violation occurred, the officer should prevail if the plaintiff's right "was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991).

Under *Saucier v. Katz*, to analyze a qualified immunity claim, a court will determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the defendants violated the claimant's constitutional rights. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[4]  If the answer is no, the analysis ends.  If, on the other hand, the answer is yes, the court must then consider whether the defendants are entitled to qualified immunity.  The second step requires determining "whether the right was clearly established.'" *Saucier*, 533 U.S. at 201.  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*  "If an officer makes a reasonable mistake as to what the law requires, the officer is entitled to immunity." *Johnson v. Figueroa*, 2011 WL 3701419 (S. D. Cal. Aug. 23, 2011), *citing Saucier*, 533 U.S. at 205.

### E.      Government Code Section 845.6

California Government Code Section 845.6 provides:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but, except as otherwise provided by Sections 855.8 and 856, a public employee, and the public entity where the employee is acting within the scope of his employment, is liable if the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care. Nothing in this section exonerates a public employee who is lawfully engaged in the practice of one of the healing arts under any law of this state from liability for injury proximately caused by malpractice or exonerates the public entity from its obligation to pay any judgment, compromise, or settlement that it is required to pay under subdivision (d) of Section 844.6.

---

[4]In *Pearson v. Callahan*, the Supreme Court gave the lower courts discretion to either follow the two step *Saucier* analysis or to start by addressing whether the right in question was clearly established. *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009).

Cal. Gov. Code § 845.6.[5]  Section 845.6 authorizes a cause of action against a public entity only for its employees' failure to summon immediate medical care, not for employee malpractice in providing the care. *Watson v. State*, 21 Cal.App.4th 836, 841-842 (1993)(duty under § 845.6 "to take reasonable action to summon " immediate medical care does not encompass duty to provide reasonable or appropriate care); *Nelson v. State of California*, 139  Cal.App.3d 72, 81 (1982) (failure to exercise diligence, care and skill ordinally practiced by professionals is malpractice but not a violation of section 845.6).  Liability is limited to "neglect of a serious and obvious medical condition." *Lawson v. Superior Court*, 180 Cal.App.4th. 1372, 1385 (2010).  Liability is also limited to "those situations where the public entity intentionally or unjustifiably fails to furnish immediate medical care. *Watson*, 21 Cal.App.4th at 841.

## VI.    DISCUSSION

### A.    Eight Amendment Claim

#### 1.    Existence of a Serious Medical Need

Plaintiff must first show a serious medical need  by showing  "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)(citations omitted.)  Although Plaintiff is not particularly clear, it appears that he alleges that his serious medical need was a disorder in his gallbladder.  Plaintiff has not alleged, no less offered any evidence as to how the failure to treat the gallbladder condition could have resulted in further significant injury.  Read liberally, however, Plaintiff argues that the failure to identify his condition in a timely manner lead to the unnecessary and wanton infliction of pain.

The record contains ample evidence that Plaintiff did have a condition that eventually warranted surgery.  The ultrasound performed on July 12, 2008 indicated gallstones or sludge, an enlarged spleen and a dilated kidney. (Opp. to MSJ Ex. A.)  Moreover, the surgical report states that Plaintiff had "medium size stones." (Opp to MSJ. Ex. B.)  Plaintiff also provides his uncontradicted and documented allegations of significant pain.  Accordingly, on the evidence presented, the Court  Recommends  finding a genuine issue of material fact as to whether Plaintiff had a serious medical condition.

#### 2.    Deliberate Indifference of Aymar

As described above, in order to have a culpable state of mind a defendant must: "(1) be actually

---

[5]Sections 855.8  and 856 address mental illness and are not relevant here.

1    aware of facts from which an inference could be drawn that a substantial risk of harm exists, (2) actually

2    draw the inference, but (3) nevertheless disregard the risk to the inmate's health." *Farmer*, 511 U.S. at

3    837-8.

4            Plaintiff was only treated by Dr. Aymar two times:  on September 19, 2007 and on October 25, 2007.

5    Aymar did not see Plaintiff again, but she did receive the results from the urinalysis and reviewed them on

6    November 6, 2007.  The urinalysis report did not demonstrate any factors requiring additional follow up and

7    Dr. Aymar had no further interaction with Plaintiff. (NoL Ex. 20, Aymar Decl. ¶ 10.)  By February of 2008,

8    Dr. Aymar had stopped working at Centinela and was no longer treating prisoners.  (Aymar Decl. ¶ 11.)

9    Additionally, when Plaintiff saw Nurse Manaig on September 12, 2007, he indicated that he did not have

10   any flank pain at that visit.  (AGO-149.)  On the September 19, 2007 visit with Dr. Aymar, Plaintiff

11   indicated that his fatigue had resolved.  (NOL 15.)  Moreover, Plaintiff made no medical requests relating

12   to kidney pain between September 12, 2007 and December 12, 2007, although he did make two requests

13   relating to other health issues.

14          Plaintiff argues that Defendant Aymar was deliberately indifferent because she did not palpitate the

15   areas of his kidney and liver (Opp. at 2.)  This fact, however, does not establish that Dr. Aymar either 1) was

16   aware of facts from which an inference could be drawn that a substantial risk of harm exists or 2) that she

17   drew such an inference, or 3) that she nonetheless disregarded the harm.

18          Plaintiff also argues that Aymar's deliberate indifference is evident because he told her of his fear

19   of kidney damage and she replied "you can't prove it." This testimony, even if admissible, does not establish

20   that Dr. Aymar drew an inference of substantial harm or disregarded it.

21          Plaintiff next argues that Dr. Aymar told him "it was probably depression." (Opp. at 7.)  This

22   statement, however, does not tend to show that she drew an inference of substantial risk of harm.  In fact,

23   it tends to show that she did not draw such an inference.

24          Plaintiff next argues that Dr. Aymar did not order any tests, medicine or follow up for his severe

25   pain.  (Bovarie Depo. Tr. at 26, NOL Ex. 1.)  Dr. Aymar, however, conducted a physical exam and detected

26   no problems.  She also reviewed the lab results from August 2007 and did not see any issues which would

27   raise any concerns.  (Aymar Decl. ¶ 4.)  The medical record from the September 19, 2007 visit also indicates

28   that Plaintiff's fatigue had resolved.  Moreover,

> the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.

*Estelle v. Gamble*, 429 U.S. 97, 107 (1976).

Thus, the uncontradicted evidence does not contain any evidence indicating that Defendant Aymar had drawn an inference of substantial risk of harm.[6] Accordingly, the Court Recommends finding that no reasonable jury could find that Defendant Aymar acted with a culpable state of mind; that she drew an inference of substantial risk or harm; or that she disregarded that inference.

### 3.   Deliberate Indifference of Manaig

Plaintiff claims that Defendant Manaig was deliberately indifferent to a serious medical need because he referred Plaintiff for mental health screening in June of 2007.  Plaintiff bases his conclusion on the ultrasound results in July of 2008.  Those results, however, were not available until well over a year after Defendant Manaig referred Plaintiff for the mental health screening.  Accordingly, the ultrasound cannot show that Defendant Manaig was aware of any serious medical need.  While the ultrasound does have some tendency to prove that Plaintiff had a serious medical condition, it does not prove in any way that Defendant Manaig was aware of that condition (if it existed at the time.)  Additionally, as discussed above, the medical records contain support for Manaig's belief that Plaintiff could benefit from a mental health screening.  Moreover, as Defendant Manaig referred Plaintiff for both a mental health screening and a visit with the doctor, the referral to mental health screening is not evidence that Defendant Manaig denied or delayed treatment to Plaintiff.  Finally, Defendant Manaig found no indications of flank pain, low back pain, urinary frequency, dysuria, burning on urination, hematuria, muscle spasms, numbness, or tingling.  Plaintiff's vital signs were normal.  And the urine dipstick analysis was negative for signs of infection.  (Manaig Decl. ¶ 5, AGO - 155, 157,  457.)  Accordingly, there is no evidence that Defendant Manaig either drew an inference that Plaintiff was suffering from a serious medical condition or consciously disregarded a risk to Plaintiff's health.

The only complaint Plaintiff articulates against Manaig is for the referral for mental health screening. Plaintiff argues that, because he has never been found to suffer from any mental health issue, the referral

---

[6]As described above, Defendant Aymar also saw Plaintiff on October 25, 2007, but the records contain no indication that Plaintiff mentioned his "kidney" problems at that visit.

1   must have been in deliberate indifference to a serious medical need.  Plaintiff's logic is flawed.  First, the

2   fact that no mental health issue was found does not render the referral inappropriate.  Second, Plaintiff

3   asserts that the mental health referral caused a month and a half delay in seeing a doctor.  (Sur-Reply at 6.)

4   The facts do not support this argument.  Plaintiff saw Dr. Khatri on August 1, 2007.  (Khatri Decl. ¶ 4.)

5   Plaintiff did not request medical attention until June 21, 2007 and was not seen by Manaig until June 25,

6   2007.  Thus, the delay was, at most, a little more than a month.  Additionally, there is no evidence in the

7   record to indicate whether the mental health referral delayed the doctor visit at all, as Manaig made a

8   medical referral at the same time as the mental health referral.  Finally, when Plaintiff saw Dr. Khatri, he

9   did not mention any issue relating to his kidney or abdominal pain.  (Khatri Decl. ¶ 4.)  Thus, the delay, if

10  any, was rendered meaningless by Plaintiff's failure to even raise the issue when he did see a doctor.

11          To the extent that Plaintiff intended to argue that Manaig was responsible for any other delay in his

12  surgery, there is no evidence to support that argument.  As a Registered Nurse, Manaig is not qualified to

13  recommend surgery for any conditions. This decision must be made by a physician.  (Manaig Decl. ¶ 18.)

14  Indeed, Plaintiff states: "Since Manaig is only an R.N. he can hardley [sic] dispute findings made by doctors

15  . . ." (Opp. at 4.)  Moreover, Nurse Manaig never reached a conclusion that Plaintiff was suffering from any

16  medical conditions that warranted further nursing treatment or recommendations other than that which

17  Nurse Manaig provided on the occasions he saw Plaintiff.   Finally,  Nurse Manaig never reached a

18  conclusion that  Plaintiff was not receiving medically reasonable care for any medical condition. (Manaig

19  Decl., p. 5, ¶ 18.)  Specifically, Manaig declares:

20              I have never been made aware of any facts from objective medical testing or
            evaluation that led me to believe that Plaintiff was suffering from any serious
21          medical   condition   that   warranted   further   nursing   treatment   or
            recommendations than what I provided on the occasions that I saw Plaintiff.
22          At no point did I ever intend for Plaintiff to suffer any harm or to be denied
            proper medical care for any medical conditions.  At no point did I ever reach
23          a conclusion that Plaintiff was not receiving medically reasonable care for
            any medical conditions.
24  (Manaig Decl. ¶ 18.)

25          Thus, as with Defendant Aymar, the uncontradicted evidence does not contain any evidence

26  indicating that Defendant Manaig had drawn an inference of substantial risk of harm.  Accordingly, the

27  Court Recommends finding that no reasonable jury could find that Defendant Manaig acted with a culpable

28  state of mind; that he drew an inference of substantial risk or harm; or that he disregarded that inference.

1

2                          4.    Defendant Manaig is Entitled to Qualified Immunity

3          The Court has Recommended the granting of summary judgment on the basis that there is no

4    evidence from which a reasonable jury could find that Defendant Manaig either perceived a substantial risk

5    of serious harm or recklessly disregarded that risk.  Even if there were a genuine dispute as to whether

6    Defendant Manaig was deliberately indifferent, he still might be entitled to summary judgment on the basis

7    of qualified immunity. "Courts may not simply stop with a determination that a triable issue of fact exists

8    as to whether prison officials were deliberately indifferent; instead, the qualified immunity inquiry is

9    separate from the constitutional inquiry, and courts must undertake the qualified immunity analysis

10   separately." *Estate of Ford v. Ramirez-Palmer*, 301 F.3d. 1043, 1050 (9th Cir. 2002).  Accordingly, the

11   Court, in an excess of caution, turns to the qualified immunity analysis.

12         "Government officials enjoy qualified immunity from civil damages unless their conduct violates

13   'clearly established statutory or constitutional rights of which a reasonable person would have known.'"

14   *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (*quoting Harlow v. Fitzgerald*, 457 U.S. 800, 818

15   (1982))  Here, a prisoner's right to medical care for serious medical needs was clearly established.  The key

16   question here is, under the second part of the *Saucier* inquiry: "Under that law could a reasonable state

17   official have believed his conduct was lawful?"  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  It must be

18   determined "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

19   he confronted." *Saucier*, 533 U.S. at 201. Thus, the question for qualified immunity boils down to whether

20   a reasonable Registered Nurse confronted with Plaintiff's symptoms could have believed it lawful to refer

21   him for examination by a mental health professional as well as a medical professional.

22         Defendant Manaig argues that he is entitled to qualified immunity because a reasonable registered

23   nurse would not have known that referring a patient for both mental health and medical appointments was

24   unlawful.  There is no evidence in the record that raises a dispute. On the facts presented in this case, a

25   reasonable nurse in Manaig's position could have believed his conduct was lawful.  Accordingly, the Court

26   Recommends Defendant Manaig be found entitled to qualified immunity.

27   ///

28   ///

B.     **State Law Claims**

1.     <u>Defendant Manaig's Request to Decline to Exercise Supplemental Jurisdiction</u>

Defendant Manaig requested that the Court decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  Defendant Manaig correctly asserts that the Court has discretion under 28 U.S.C. §1367(c)(3) to decline to exercise jurisdiction over state law claims after dismissing the claims that served as the basis for federal jurisdiction.  In deciding whether to exercise supplemental jurisdiction "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988).  This case has been pending in this court for three years and has been thoroughly litigated during that time.  When the federal claims are eliminated late in the action,  "after there has indeed been substantial expenditure in time, effort, and money in preparing the dependent claims, knocking them down with a belated rejection of supplemental jurisdiction may not be fair." *Hansen v. California Dept. of Corrections*, 920 F.Supp. 1480, 1500 (N.D. Cal. 1996), *quoting* 28 U.S.C.A. § 1367 Practice Commentary at 835-36 (1993)  At this late stage of the proceedings, when all discovery has been taken and all pretrial motions filed, judicial economy, convenience and fairness  point towards maintaining jurisdiction over this case.  Accordingly, the Court Recommends that Defendant's Request to Decline to Exercise Supplemental Jurisdiction be DENIED.

2.     <u>California Government Code Section 845.6</u>

Under California Government Code Section 845.6, a claim exists for failure to summon medical care when "the employee knows or has reason to know that the prisoner is in need of immediate medical care and he fails to take reasonable action to summon such medical care."  Cal. Gov. Code § 845.6; *see also Watson v. State of  California*, 21 Cal.App.4th 836, 841 (1993).  The duty under this section is to **summon** medical care; there is no action under section 845.6 for any complaint that care, once summoned, was inadequate. *Watson*, 21 Cal.App.4th at 843.

In this case, the undisputed facts show no failure to summon medical care.  Plaintiff was seen by doctors and nurses throughout the time period in question.  In the case of Defendant Manaig, he referred Plaintiff to both medical and mental health screening as well as providing care.  In the case of Dr. Aymar, she was the doctor rendering medical care and the only cause of action is for malpractice. At the heart of

1   Plaintiff's complaint is the argument that Defendants misdiagnosed his gallstones.  "There is no merit to the

2   argument that the misdiagnosis triggered section 845.6 liability based on the alleged failure to summon

3   reasonable medical care."  *Watson*, 21 Cal.App.4th at 843.  Accordingly, the Court Recommends that

4   Summary Judgment be Granted to Defendant Aymar and Defendant Manaig on the Government Code

5   Section 845.6 claim.

6                   3.   Malpractice

7           In order to prevail on his claim for medical malpractice, Plaintiff must show that Defendants failed

8   to "exercise in diagnosis and treatment that reasonable degree of skill, knowledge and care ordinarily

9   possessed and exercised by members of the medical profession under similar circumstances."  *Munro v.*

10  *Regents of University of California*, 215 Cal.App.3d 977, 984 (1989).  "Whenever the plaintiff claims

11  negligence in the medical context, the plaintiff must present evidence from an expert that the defendant

12  breached his or her duty to the plaintiff and that the breach caused the injury to the plaintiff."  *Powell v.*

13  *Kleinman*, 151 Cal.App.4th 112, 123 (2007).

14                  a.     Defendant Aymar

15          As described fully in the facts section above, Dr. Aymar only saw Plaintiff twice:  On September

16  19, 2007 and October 25, 2007.  On the September visit, Plaintiff reported that the fatigue that he attributed

17  to his kidney pain had resolved.  Dr. Aymar performed a physical examination and reviewed the results of

18  blood tests performed in August of 2007.  Neither the examination nor the blood test results indicated any

19  physical problems.  When Plaintiff saw Dr. Aymar in October of 2007, he was seeking medical refills for

20  migraine headaches and knee pain.  Dr. Aymar ordered an xray of the knee and a urinalysis and ordered

21  prescriptions for aspirin and migraine medication.  The medical records contain no mention of kidney pain

22  and the urinalysis indicated no factors requiring additional testing.  In fact, Plaintiff's extensive medical

23  records indicate no mention of kidney pain until December 12, 2007.

24          Dr. Aymar provides the opinion of Dr. Howard Williams, stating that Dr. Aymar's treatment was

25  appropriate and within the standard of care.  (Williams Decl. ¶ 19, 20.)  Dr. Williams also opines "it is my

26  opinion, to a reasonable degree of medical certainty, that Dr. Aymar did not cause any damage to Plaintiff."

27  (Williams Decl. ¶ 21.)

28          In Opposition, Plaintiff argues that Dr. Aymar was negligent  "by doing nothing at all for Plaintiff's

1   stabbing kidney pain that she not only knew of but knew had been going on for 3 months." (Opp. at 11.)

2   Plaintiff also addressed the negligence claim in his Sur-Reply, claiming Dr. Aymar's "failure to do anything"

3   was "so obviously unreasonable that the doctrine of *res ipsa loquitur* applies and the need for an expert is

4   obviated." Plaintiff concludes "zero care for complaints of severe pain is unreasonable, the standard of care

5   was obviously violated." (Sur-Reply at 5.)    Plaintiff is correct that expert testimony is not necessary

6       when a layperson is able to say as a matter of common knowledge and observation that the
        consequences of professional treatment were not such as ordinarily would have followed if
7       due care had been exercised. The classic example, of course, is the X-ray revealing a scalpel
        left in the patient's body following surgery. Otherwise, expert evidence is conclusive and
8       cannot be disregarded.

9   *Robinson v. Kaweah Delta Hosp.*, 2010 WL 4644414 (E.D. Cal. Nov. 5, 2010) *quoting Flowers v. Torrance*

10  *Memorial Hospital Medical Center,* 8 Cal.4th 992, 1001 (1994). Plaintiff, however, is incorrect in asserting

11  that his circumstances are akin to a surgeon leaving a scalpel in his body.  Plaintiff's claim against Dr.

12  Aymar is that her failure to act speaks for itself and any layperson would know that such failure represents

13  a deviation from the standard of care.  No reasonable jury could find as a matter of common knowledge that

14  Dr. Aymar's reliance on her physical examination along with the results of blood and urine tests was

15  obviously outside the relevant standard of care.

16      In sum, Defendant Aymar presents medial expert opinion that her care was within the standard of

17  care and Plaintiff presents an argument that Dr. Aymar failure to act "obviously" fell below the standard of

18  care.  Plaintiff's own opinion and skewed characterization of events does not suffice to create a genuine

19  issue of material fact.  Dr. Aymar did not fail to act, she conducted an examination, and reviewed blood and

20  urine tests, all of which indicated no physical problems.  Accordingly, there is no genuine dispute as to

21  whether Dr. Aymar violated the standard of care and the Court Recommends that Summary Judgment be

22  granted to Dr. Aymar on the medical malpractice claim.

23                      b.    Defendant Manaig

24      Defendant Manaig provides a supplemental declaration stating his own opinion that the care he

25  provided to Plaintiff met the relevant standard of care. (Manaig Supp. Decl.¶¶ 2-3.) Defendant Manaig

26  asserts that his care on June 25, 2007  was appropriate, specifically, he performed a urine dipstick analysis

27  that was negative for signs of infection, Plaintiff's vital signs were normal and Defendant Manaig did not

28  see any indication of a serious medical condition. (*Id.*). On September 12, 2007, Defendant Manaig

                                            23                              08cv1661 LAB (NLS)

responded to Plaintiff's complaints of kidney pain with a referral to a physician as he did in response to Plaintiff's February 21, 2008 request for care.  Manaig further declares that a physician must determine whether a patient receives surgical intervention for internal organ problems, as a Registered Nurse is not authorized to make that decision.  (Manaig Decl. ¶ 2.)  Manaig also points out that between June 25, 2007 and his departure from Centinela, Plaintiff saw: Dr. Khatri on August 1, 2007, (AGO 42, 151,); Dr. Aymar on October 25, 2007 (AGO-39, 146)[7], Dr. Navamani on January 25, 2008, March 5, 2008  and June 18, 2008, (AGO-35, 37, 133, 140, and 492);  Dr Davenport on July 19, 2008 and  September 29, 2008 (AGO 29, 121, 128); Dr. Vonlintig on August 4, 2008, (AGO 31, 125), and was seen twice at Pioneers Memorial Healthcare District Hospital on July 18, 2008 and July 21, 2008 (AGO 431, 432, 545-550, 553).  During the same time, Plaintiff received blood and urine tests, an ultrasound and two CT scans to determine whether there were any internal organ problems warranting medical care.  (AGO 131, 132, 139, 431, 432, 448, 449, 451, 492, 545-550 and 553.)

Defendant Manaig argues that, as a Registered Nurse, all he could do was refer Plaintiff to a physician, which he did.  The physicians ordered an ultrasound and two CT scans.  Moreover, on July 18, 2008, Pioneers Memorial Healthcare District Hospital released Plaintiff with the specific finding of "no evidence for any emergent conditions were found."  Plaintiff returned again to Pioneers Memorial Healthcare District Hospital on July 21, 2008, where a second CT scan showed the kidneys to be "normal" and the gallbladder to be "unremarkable."

Defendant Manaig argues that he is entitled to summary judgment based on his own expert testimony that the care he rendered fell within the normal standard of care.  The Court has found no case in which the defendant put forth his **own** expert opinion as to the sufficiency of the care he himself rendered.  The court cannot say that a self-serving declaration is sufficient to meet the burden of production to make a prima facie showing that no genuine issues of material fact exist.[8]

---

[7]Plaintiff also saw Dr. Aymar on September 19, 2007 (NOL Ex. 15.)

[8]Dr. Barreras, when a Defendant in this case declared: "Based on my review of Plaintiff's medical records, it is my opinion (as a licensed physician and based on my training and experience and to a reasonable degree of medical certainty) that Plaintiff was not being deprived of medically necessary and reasonable care for any medical condition (including any liver, kidney, gallbladder , spleen, or other internal organ pathology) at any time before his transfer to Avenal State Prison while he was at Centinela in 2007 and 2008."  (Barreras Decl. ¶ 7.)  Dr. Barreras provides almost ten pages of specific

This defect, however, is not fatal to Defendant Manaig's motion for Summary Judgment. The Supreme Court has stated: "we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party "need not produce any evidence at all" on matters which the opponent will have the burden of proof at trial. The moving party's burden of demonstrating that it is entitled to judgment as a matter of law may be satisfied  by "pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Interpreting this Supreme Court precedent, the Ninth Circuit reasoned:

> a moving party without the ultimate burden of persuasion at trial thus may carry its initial burden of production by either of two methods. The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

*Nissan Fire & marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

Thus,  Defendant Manaig, as the party moving for summary judgment, bears the burden of identifying the portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact, but need not produce evidence negating an element on which Plaintiff bears the burden of proof at trial. Here, Plaintiff bears the burden of proving that Defendant Manaig's care fell below the community standard of care and, under California law, Plaintiff must produce expert opinion to prove that a Defendant breached the duty of care owed. Here Plaintiff has no expert evidence that any Defendant provided care below the community standard of care.

Plaintiff opposes summary judgment, arguing that Defendant Manaig's "disregard of doctor's prescriptions and Plaintiff's pain ... it seems the Defendants' actions are so obviously unreasonable that the doctrine of res *ipsa loquitur* applies and the need for an expert is obviated." (Sur-Reply at 5.)  Plaintiff, however, does not provide any explanation or evidence of the alleged disregard of doctor's prescriptions.[9]

---

facts supporting this opinion.  As Chief Medical Officer of Centinela, and a Defendant in this action at the time he signed the declaration, Dr. Barreras suffers from the same bias as Defendant Manaig and his declaration cannot negate the possibility that a reasonable jury could find for the Plaintiff.

[9]It is possible that Plaintiff is referring to an argument he made in Opposition to the Motions for Summary Judgment that the referral to mental health screening was wrongful because Plaintiff had been treated for stomach problems by doctors and prescribed medication by doctors.  (Opp. at 4.)  If so, Plaintiff argues, at most, that he disagrees with Manaig's assessment that mental health screening was appropriate.  Plaintiff provides not even an argument that Manaig interfered with Plaintiff's treatment by

1  Moreover, Defendant Manaig did take action in relation to Plaintiff's pain:  he referred Plaintiff for medical

2  and mental health appointments.  Finally, as discussed above, whether the tests and care provided were

3  within the community standard of care is beyond the knowledge of the layperson and the doctrine of *res ipsa*

4  *loquitur* does not apply to obviate the need for expert opinion.

5  **VII.    Renewed Request for Appointment of Medical Expert**

6        Plaintiff argues: "Should the fact that plaintiff does not have a medical expert  witness become

7  determinative on Summary Judgment a medical expert should be appointed."  (Sur-Reply at 6.)

8        **A.       Plaintiff's Request is Untimely**

9        On April 26, 2010, the Court issued a Scheduling Order setting a deadline of  July 26, 2010 to

10  identify all experts.  [Docket No. 64.]    Plaintiff originally sought the appointment of a medical expert on

11  June 18, 2010.  [Docket No. 67.]  On July 27, 2010, the Court denied that request without prejudice.

12  [Docket No. 70.] On  November 2, 2010, the Court issued an Amended Scheduling Order and set a deadline

13  of March 14, 2011 for the filing of all pre-trial motions and setting a deadline of May 23, 2011 for

14  identification of all witnesses.

15        Plaintiff's renewed request for a medical expert was filed in his Sur-Reply to the Motion for

16  Summary Judgment, which was filed on July 8, 2011.  Plaintiff submits that the request is timely, but gives

17  no support for his belief.  Defendant Aymar filed her motion for summary judgment on March 14, 2011,

18  and in the moving papers, she argued that she was entitled to summary judgment "unless the opposing party

19  comes forward with conflicting expert evidence." (MSJ at 11, [Docket No. 91.]) Plaintiff made no renewed

20  request for appointment of a medical expert until July 8, 2011.  Accordingly, the request is untimely.  In

21  light of Plaintiff's pro se status, and in an excess of caution, the court will consider whether the request

22  should be granted, if deemed timely.

23        **B.       28 U.S.C. § 1915**

24        Federal courts may permit commencement of suit without prepayment of fees and costs upon a

25  showing of indigency and allow indigents who are unable to pay the entire filing fee upon filing to pay in

26  installments. 28 U.S.C. § 1915(a)&(b). Section 1915, however, does not authorize federal courts to finance

27  _____

28  refusing to provide medication prescribed by a doctor.

1   or subsidize a civil action or appeal by paying expert fees or other costs.  *Hadsell v. Internal Revenue*

2   *Service*, 107 F.3d 750, 752 (9th Cir. 1997); *Dixon v. Ylst*, 990 F.2d 478, 480 (9th Cir. 1993); *see also*

3   *Dawson v. California Dept. of Corrections*, 2007 WL 2288327 (N.D. Cal. Aug. 7, 2007).

4     **C.**  **Federal Rule of Evidence 706**

5     Federal courts have authority to appoint experts under Federal Rule of Evidence 706: "The court

6   may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own

7   selection." Fed.R.Evid. 706(a).  The appointment of an expert is not mandatory and left to the discretion

8   of the court. *Dawson v. California Dept. of Corrections*, 2007 WL 2288327 at * 6 (N.D. Cal. Aug. 7, 2007).

9   When adjudicating a request for appointment of an expert, it is generally appropriate for courts to provide

10  a reasoned explanation for its determination of the request.  *See Gorton v. Todd*, 2011 WL 2557505 (E.D.

11  Cal June 29, 2011)(requiring reasoned articulation despite a lack of  9th Circuit law requiring such

12  articulation.)[10]

13    Experts appointed by the courts in civil actions must be "paid by the parties in such proportion and

14  at such time as the court directs."  Fed. R. 706(b). Where there are complex and/or compelling

15  circumstances and one party is indigent, federal courts have discretion to appoint an expert and apportion

16  all of the costs to an opponent "when the expert would significantly help the court." *McKinney v. Anderson*,

17  924 F.2d 1500, 1511 (9th Cir. 1991), *overruled on other grounds by Helling v. McKinney*, 502 U.S. 903

18  (1991).   Expert witnesses, however, cannot be appointed solely to aid the litigant in presenting his case,

19  witnesses can only be appointed where necessary to aid the court.  *Gomez v. Sogge*, 2010 WL 2612319

20  (N.D. Cal. June 24, 2010), *citing Hannah v. United States*, 523 U.S. 597, 600 (5th Cir. 2008)(affirming

21  district court's refusal to appoint expert witness for *pro se* prisoner alleging inadequate medical care.)  In

22  other words, Rule 706 cannot be used as "a means of sidestepping" Section 1915 and its prohibition against

23  appointing an expert witness to assist indigent litigants.  *Stakey v. Stander*, 2011 WL 887563 at *3, n.1 (D.

24  Idaho March 10, 2011), *citing Boring v. Kozakiewicz*, 833 F.2d 468, 474 (3d Cir. 1987)( allowing a court

25  to pay for an inmate's expert witness would be "granting inmates better treatment than fellow citizens who

---

27    [10]In *Gorton*, the District Court Judge found the Magistrate Judge's adjudication of the request to
appoint an expert clearly erroneous because of the failure to provide a reason for the denial.  The
District Court Judge also found  the facts of that case suggested an expert might have been necessary to
28  promote accurate factfinding.

are not incarcerated".); *see also Hooker v. Adams*, 2007 WL 4239570 at *2 (E.D. Cal. Dec. 3, 2007)(noting the "burgeoning docket" of inmate civil rights cases and urging caution in apportioning the costs of expert witnesses to the government.)

In this case, the court has no need for an independent expert witness.  As to the 8th Amendment Claim, a medical expert would not add anything on the questions of whether Defendants Aymar and Manaig perceived a serious medical need or whether they consciously disregarded that need.  Accordingly, a medical expert would not be helpful to the court as trier of fact.

Regarding the medical malpractice claim, again the medical testimony is not necessary to aid the court.  The testimony provided by Defendant Aymar's expert witness and by Defendant Manaig is simple and straightforward.  The Court perceives no need for an independent medical expert to clarify or explain the issues.  As described above, Defendant Aymar has provided clear evidence that the care  provided did not fall below the standard of care.  Additionally,  Defendant Manaig has met his burden by pointing out the absence of evidence on a matter which Plaintiff bears the burden of proof at trial.  Moreover, Plaintiff's state law claims do not implicate constitutional concerns, which weighs against appointing an expert to be funded by defendants. *Starkey*, 2011 WL 887563 at *3, n.2(declining to consider Plaintiff's state law claims as a basis to appoint an expert).  Accordingly, the Court Recommends that the untimely, renewed request for appointment of a medical expert be DENIED.[11]

## VIII.   CONCLUSION

Based on the foregoing reasons, the Court hereby **RECOMMENDS** that:

1.    Defendant Aymar's motion for summary judgment be GRANTED;

2.    Defendant Manaig's Motion for Summary Judgment be GRANTED;

3.    The Court find Defendant Manaig is entitled to qualified immunity;

4.    Defendant Manaig's Request that the Court Decline to Exercise Pendant Jurisdiction over the State Law Claims be DENIED; and

---

[11]If a neutral expert were necessary to aid the court in accurate factfinding on the state law claims, that would raise serious concerns about whether to exercise supplemental jurisdiction over those claims.  The questions of judicial economy, convenience and fairness would be greatly affected by the prospect of a trial to be held solely on state law claims so complex as to require the appointment of an independent expert.

5.      Plaintiff's Renewed Request for Appointment of Medical Expert be DENIED.

The undersigned Magistrate Judge submits this report and recommendation pursuant to 28 U.S.C. § 636(b)(1) to the United States District Judge assigned to this case.

**IT IS ORDERED** that no later than ***October 5, 2011*** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than ***October 17, 2011*** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  September 21, 2011

Hon. Nita L. Stormes
U.S. Magistrate Judge
United States District Court